Consolidated case numbers 22-5424, United States of America v. James Charles, and 22-5427, United States of America v. Vincent Vassar. Ten minutes for each defendant, 20 minutes for plaintiff. Mr. Sparks, you may proceed for the appellants. Thank you. May it please the court, Andrew Sparks on behalf of the appellant James Charles. I'd like to reserve two minutes for rebuttal, please. Thank you. Mr. Charles was convicted of six counts at trial and sentenced to 380 months of imprisonment. There are several issues with these counts that require either a new trial or remand for resentencing. First, the government failed to prove a conspiracy in this case. The superseding indictment charged James Charles as co-defendant Vincent Vassar with conspiracy to distribute methamphetamine. The time period for this is January 2021 through June of 2021. Mr. Charles and Mr. Vassar are gentlemen in their mid-50s and are lifelong friends. The government's proof that Mr. Vassar and Mr. Charles conspired are two separate instances. One is a controlled buy that occurred on February 8th, 2021. This controlled buy was between Mr. Vassar and a confidential informant. The facts are this. Mr. Vassar was staying at Mr. Charles' house. Mr. Vassar lived in California and commuted back at times and sometimes stayed with Mr. Charles. He was staying with Mr. Charles on February 8th, 2021. Vassar borrowed a car that was registered to Mr. Charles' partner and the mother of his children's. It was registered to her. He borrowed that car to go meet the informant. Mr. Vassar stored drugs at Mr. Charles' house. There's also part of the recorded conversation where Mr. Vassar says to the confidential informant, I ain't gonna let anybody know I've been looking for somebody like you and you've been looking for somebody like me. Mr. Charles was not present. That is the entirety of the proof of a conspiracy on February 8th between Vassar and Charles. There was no proof Mr. Charles knew about the meeting. There was no proof Mr. Charles supplied the drugs. There was no proof that Mr. Charles received any profits from that meeting. Despite a six-month investigation, there was no evidence of drug dealing by Mr. Vassar or Mr. Charles in January. There was nothing after February 8th. There was nothing in March. There was nothing in April. There was nothing in May. There was nothing until June 8th, which is the next date. On this particular date, Mr. Vassar was in California. Confidential informant at the direction of the police called Mr. Vassar, I mean called Mr. Charles. Did not get a hold of him. Confidential informant then called Mr. Vassar. Mr. Vassar said that he would talk to, quote, his guy. His guy is never actually identified. Mr. Vassar said his guy was in Frankfurt with his son. We know that is not true because Mr. Charles was in Lexington the entire time under police surveillance. Eventually, Mr. Sloan gets through to Mr. Charles. I'm sorry, the confidential informant, Mr. Sloan, gets through to Mr. Charles, asks for three pounds of methamphetamine. Mr. Charles drives to meet with him, is interdicted on his way by the state police, and is arrested. That is the entirety of the proof on June 8th. So the conspiracy, the evidence of the conspiracy is this. Is that Mr. Charles sold meth, Mr. Vassar sold methamphetamine, and that they were lifelong friends. There is no proof that was put forth at trial that they shared profits, that they otherwise agreed to distribute drugs. There's also a reference- How does that fit with United States versus Sadler? I understand that Sadler was a very different sophistication level of drug trafficking, but isn't this like Sadler in that it did involve a pretty large quantity of drugs, and at least some sort of either an implicit or an explicit agreement to distribute methamphetamine. Isn't that enough under Sadler? No, Your Honor, I do not believe that is enough for a couple of reasons. One is just the limited exposure or limited drug trafficking that was seen during a six-month investigation that involved a confidential informant, a cooperating witness, poll cameras, live surveillance, and car trackers. And so despite that, the only two instances of a conspiracy were this, were the February 8th dealing, Mr. Vassar and the confidential informant, and then the June 8th dealing and the subsequent search of Mr. Charles' home. And with this, there was drugs found in Mr. Charles' home. There's no doubt about that. Approximately $40,000 worth of drugs were found in his home. But there's no evidence that Mr. Vassar and Mr. Charles were conspiring together to distribute that. There's no evidence of that. The evidence was that somebody else was living in the basement at times. There was men's clothing, men's shoes, and that's where the majority of the drugs were found, and that's where the majority of the guns were found. Mr. Charles lived upstairs in a bedroom with his partner is where he lived. And so I think there is a difference between this just because of the very limited interaction. The government actually pointed to a trial that Mr. Vassar and Mr. Charles were actually conspiring together. Now, what we presented in the trial was that Mr. Charles had his own drug trafficking operation, Mr. Vassar had his own drug trafficking operation, but they were not a conspiracy working together, and I think that's the difference, Your Honor. I would like to bring. And the testimony of, is it Cloyd? Mr. Cloyd, yes, ma'am. Mr. Cloyd, who was also initially alleged to be part of the conspiracy. And what about his testimony? So Mr. Cloyd testified that he never bought drugs off of Mr. Vassar, ever. He said he had control buys on him on June 7th and 14th, I believe, two days in early January. He said he bought, he had previously bought drugs from Mr. Charles, but he never identified when during the time period of the indictment that that was purchased. Also noteworthy is this, is that the evidence at trial was that Mr. Vassar cut Mr. Cloyd out of the conspiracy, if there is one. Mr. Vassar actually came in and stole the confidential informant, Mr. Sloan, as a client from Mr. Cloyd. And that makes no sense if there's a conspiracy. If Mr. Charles is the head of a conspiracy, like the government alleges, why does he want people working for him undermining the profits of the conspiracy? It makes no sense. It makes perfect sense if Mr. Vassar is running his own drug trafficking operation, and so is Mr. Charles. I would also note that while we don't have, we don't know for sure where the money came from, where the drugs came from that Mr. Cloyd bought, sold to the confidential informant, we do know that afterwards he did not share any profit with that, with Mr. Charles, because he was under surveillance by police at that time. I would just very briefly, I'm about to run out of time here, the 924C charge I believe should, if there's no conspiracy, the charge is with the conspiracy, with the drug trafficking, so it will go away. Second of all, it was just found in the basement, in the bedroom closet. All the drugs were in the basement. And with that, I am out of time. Your Honor, there was the cash, there's $24,900 I believe, which was in the upstairs bedroom, where there were two firearms that were actually charged. The drugs were actually in the downstairs basement, where I think the other 12 guns were located. Well, Your Honor, there's no proof whatsoever that Mr. Charles, during the six-month period, was selling drugs to anybody and got $25,000 worth of drugs. The provenance of this cash was never determined or never put in, never proven to the jury. It's just an assumption the government made that it was drug proceeds. I know your time is up, but I do have one quick question for you. The June transaction in which Sloan calls Vassar to make a transaction, Vassar refers him, I thought it was to Charles. You're saying that it was generally to his guy. Be that as it may, it turns out that Charles provides the drugs to Sloan on that day, right? Yes, Your Honor. So if we can't, he didn't magically deliver them to Vassar, or to Sloan, excuse me. So wouldn't we have to presume that Vassar reached out to him? I mean, couldn't the jury infer that Vassar reached out to Charles to do that transaction since ultimately Charles consummated the transaction? Your Honor, the recorded call was between the confidential informant Sloan and Mr. Charles. He actually contacted him directly. Okay. With that, my time is up, so thank you. Good afternoon, Your Honors. I'm Dennis Torres. I represent Mr. Vincent Adams Vassar in this case, the second defendant. I want to back up. This case has three themes. Confusion in the investigation phase, I want to talk about that a little bit. A jumbled up set of issues in the trial phase, and a lot of confusion in the sentencing phase. This is how this case began. Let's go through the players. Sloan is doing drug deals prior to January 2021. 2021 is the year the conspiracy is charged from January to June 2021, those six months. But in fact, as you read through the sentencing arguments I make in my brief, October, November, and December 2020 still come in as relevant conduct. Why? Because we know the testimony, Sloan is doing deals with Cloyd, is doing deals with Charles. Sloan gets caught. Sloan, by the way, is doing deals with some other guy named John Larson. John Larson, I think it is. The fact is, pardon? No relation. None, Your Honor. The fact is, all of them at that point, Cloyd, Sloan, Charles, all are doing independent drug dealing. We know that. And the other person. And other people. What happens is the government, first the state, then the federal, start doing controlled buys as of January 2021. Why? Because Sloan at this point has turned to be cooperative witness for the government. Why? Because he's been caught on the state side. And now the feds have been brought in. Why? There's testimony. This federal government wanted to create now a conspiracy. Even though they had controlled buys on Cloyd, a co-defendant here, Charles, one of the co-defendants, and Sloan, the cooperating witness, they wanted to do better. So what happened is in January 7th and January 14th, 2021, first month of the conspiracy, we already have a controlled buy between Sloan and Cloyd. Vassar is not in the picture at this point. Then what happens is someone on the investigative side realizes, wow, wait a minute. We need to pull in Vassar. To make a true conspiracy at trial, we need to get more people involved. We got to find some semblance of an agreement. So what do they do? They get Sloan to cooperate a controlled buy on February 8th, 2021, with my client, Vincent Vassar. All of a sudden, they must have realized during the interim period from the four months, March, April, May, June, that Mr. Charles hasn't been much involved anywhere. Consequently, what do they do? They follow their same pattern, another controlled buy, this time directly with James Charles. Taking a step back, we have controlled buys independently in January with Cloyd and the confidential informant, Sloan. They take Zane Sloan then and put him what? To my client, Vincent Vassar. Why? Another person they could say is a conspirator. But these guys are all independent drug dealers. They're not conspirators. My guy's living in L.A. most of the time. Then they realize, wow, all these controlled buys aren't tying in tightly enough Mr. Charles. They wait four months and they realize our investigation on a conspiracy count, which even the government admits at trial and at sentencing is its weakest count, needs to be strengthened. We're going to do it with a controlled buy this time with Mr. Charles directly. Mr. Sparks was correct. Phone calls between Sloan and Charles ultimately occurred in June of 2021. Why? They needed the direct link with Charles. Why? Because my guy, Mr. Vassar, said I'll have my guy do it. That was unidentified. No one ever proved that he was even referring to Mr. Charles. Why is that significant? Everyone, government, judge, counsel, did follow a presumption that, oh, my God, there's enough of players, enough of buys, and enough of amounts, even pre-conspiracy, October, November, December 2020, there must be a conspiracy here. There wasn't because the history tells otherwise. Mr. Sloan. It's a strong argument, and they did admit that there was a problem with the conspiracy. But the question is not whether it was maybe the weakest part. The question is whether they made it out to the appropriate entity that's deciding credibility and choosing what happens in the case. And that's the way our system works. What is it about this case that doesn't meet the requirements of our system to have shown an adequate amount of work together with Cloyd, Vassar, and Charles, all selling methamphetamine to Sloan that is sufficient for the finder of fact to decide that's good enough as a conspiracy? Three ways, Your Honor. Sufficiency evidence means something. There's a case by this court, United States v. Pierce in 1990, drug conspiracy, where they said there's controlled buys, but there's no conspiracy at play. Insufficient evidence. And in that case, I think, provides some guidance to us today. It says at some point this sufficiency argument means something, and that if there is a legitimate reason to say, no, the jury went too far, because the government didn't provide sufficient proof on the conspiracy, the judge has to overrule the verdict. That's what sufficiency evidence is about. No one here, Your Honor. But it's about the toughest standard out there, isn't it? Judge, you just took the words out of my mouth. I was about to say, counsel will all say here, it is an immensely difficult standard to make. I'm not saying it isn't. But, Your Honor, I'll just use one example. When the government fails to provide telephone calls or surveillance involving Mr. Charles or Mr. Vassar, none of that is in the record. Or Mr. Cloyd and Mr. Vassar, none of that is in the record. We have to start taking a step back that maybe even this higher standard has been met here. There's a second reason, Your Honor. Controlled buys in sequence, separate and apart from one another, or interrelated, do not, under the law of this court and under the law of the country, do not constitute automatically conspiracy. If that were so, we wouldn't need conspiracy law. So that the jury instruction this court has approved for conspiracy is spot on. Mere association is not enough. And our point is mere association is what's driving the ship from the beginning to the end. It's driving the ship. I think of mere association as simply buyer-seller. And so frequently in these cases we say, you know, this is just a buyer-seller. This is personal use quantity. But that's not what we have here. We don't have personal use quantity. So doesn't that make a difference to the finder of fact and the judger of credibility? Not in this situation, Your Honor. The quantities are high. They're also low. The quantities in the historic period October, November, December 2020 were small amounts. But listen, I invite you to listen to the video or the transcript of the video that the government submitted with Mr. Vassar, my client, and the confidential informant, Zane Sloan. He's even saying, I'm going to cut you a better price. He's undermining any concept of conspiracy. That's almost like saying, I have a better product here to sell, and I'm going to sell it to you on the cheap. That's not conspiracy talk. Conspiracy talk is what this Court elucidated in a couple of cases I cited in my brief, where you share profits, you have a common goal, you have a common mission. This guy, my client, is undercutting, then, Mr. Sparks' client. That's not a conspiracy. Didn't Mr. Vassar, he said my guy, but didn't he also, the recorded statement, said that he would grab some methamphetamine from the house? At some point, you're talking about the June 2021 conversation. That's where he talks about the my guy. That's when he talks about the my guy. He does not refer to Mr. Charles at all in the June 21st. But the question is, you had said there was no evidence it was connected to the house. Right. Was that in the testimony? No, it wasn't connected, Your Honor, because if you listen to the conversation, he says he's in Frankfurt right now. That's not true. The government had surveillance going on Mr. Charles at that time, and he was in Lexington. I will throw out this supposition, Your Honor. If I'm right on this theory, and I believe strongly that I am, there's someone else or someone else at play here. We have no proof that there wasn't another party. I raise this question in my brief. It's an unanswered question because of the way the evidence came in in this case. Mr. Vassar could have picked up the phone and said, I know another friend in Frankfurt, I'm going to call him. That's who I was referring to. After all, we know Charles for certain was in Lexington at the time because the government was there surveilling him. And I must add, Your Honors, that's not untypical of what we have going on here, because from the very beginning of the state's investigation, they were picking and choosing different players who were truly operating independently, not as a conspiracy. So what does the government do? Very common, and sometimes successful, and sometimes even persuadable, put them all together in a big, fat mixer and we got a conspiracy. But at some point, Your Honors, despite the high level of standard of review and review by the court over a jury, you have to step in. We think this is one of those opportunities where you have to step in. It doesn't, I might add, being that Mr. Vassar, Mr. Charles Walk, they have counts separate for the controlled buys. You could almost hear the thinking of the U.S. Attorney's Office how they constructed the indictment. We're going to get them on the controlled buys. That's why they went after Charles in June of 21, when they didn't have quite enough on him. He was pretty reclusive. I appreciate the Honors. They are directed to important questions. I think probably the real issue at law is what does it mean to take this evidence and this decision interpreted in the light most favorable to the government. And I think we all struggle. That is a really, really difficult standard. But we thank you for your arguments and for the concepts. If you want to conclude in just a couple of sentences, that would be great. I do, Your Honor, and I've reserved four minutes for my rebuttal, so I'll add some of that point to that. I would just like to conclude on the themes that I've raised. I have a bad investigation. It's kind of mixed up. A jumbled up trial and a sentencing that's really, unfortunately, confusing. And then I'll address my rebuttal, Your Honors. Thank you. Thank you, sir. May it please the Court. Jake Beach on behalf of the United States. I'll jump right in what seemed to be the recurring theme. The defendants here are asking this Court to replace the judgment of the jury. As Judge Dranch pointed out, the legal standard here is to assume all inferences in favor of the jury verdict when it comes to credibility, how evidence can be interpreted for a positive or negative piece of evidence. And even with all the inferences in favor, you then ask, could any rational trier of fact find the element satisfied? That is a high standard, as this panel has pointed out in the opening. This is effectively the argument that appellants are putting forward. You have two independent drug dealers who keep their drugs in the same place, keep their guns in the same place, keep their drug proceeds in the same place, and when it comes time, they give each other referrals of customers. That is the argument that appellants are saying is the inference that this Court must take at this stage. And I'm not sure that is a plausible inference even under a non-heightened standard. I'll go through the, again, there's a lot of debates about facts. We have one of the concerning statements. The Cloyd is coming to assist with proof of the conspiracy, and he's asked, is it in a conspiracy and an agreement with others, whether he was in a conspiracy and agreement with others who were selling methamphetamine? And what he says is it was not so much an agreement and saying that he had just met Vassar. What does that mean? How can that be evidence of the conspiracy by the man testifying for the government about the existence of a conspiracy? Yes, Your Honor. So when you read that testimony from Cloyd and he's asked, were you in a conspiracy and agreement with Charles? He says, no, not so much agreement. I'm here to take responsibility for what I did. And then the prosecutor goes on to ask, OK, did you make an agreement to sell drugs? Did you purchase drugs from Charles? He said yes, and he reaffirmed it from multiple angles. It is a confusing statement, but when you look at what he says on top of not so much agreement, I believe you can read that and perhaps the jury did read that as I am not morally condoning this behavior. Because he says I'm not so much in agreement with it. I'm here to accept responsibility. And then he goes on to state clearly, yes, I agreed to buy drugs from Charles for the purpose of distribution. So I don't know how else you could read that record other than him saying I'm here to accept what I did. I guess it's not our decision about that testimony that's the key, even if I think that's a pretty big stretch that you're trying to make. The real issue is what the jury thought. So why does this qualify under Sadler, for example? This was not highly sophisticated drug dealing. It was not consistent in its end-use customers' repeated purchases. It was not a standardized nature of the sale, and it didn't use consistent procedures. So how can this case satisfy Sadler? Well, I would disagree that it was not sophisticated. They would traffic drugs, purchase them in Los Angeles, bring them to Lexington, accrue the cash, apply the cash back, and purchase more drugs. I'm not sure in Sadler what was more sophisticated about that arrangement, but there was recurring sales. You have testimony from Sloan that for at least six months he was regularly purchasing meth from Vassar. He said, I saw him at least once a week. And not only was he purchasing meth, he was purchasing cocaine and heroin. Common. What were the dealers in the record supporting? It was Vassar bringing them, or it was a multiplicity of ways that they came from California from Los Angeles? So this is the part of the testimony when they're asking TFO Park about the mail, the letters in the house. And what he says is the DEA is able to trace the chemicals within the meth and knows for certain they come from California. And then the question becomes, well, do they mail them? Do they carry on themselves when they go on a plane? And TFO Park said, no, we don't have any evidence that they do either of those things, so it is fair to infer that someone is driving the drugs back. And when you're dealing in pound quantities, you know, that's certainly a rational inference. I have some questions about other topics that weren't addressed. So I don't know if my co-panelists have done conspiracy. So do you mind if I move on? Please do. So I just have a couple of questions about, first of all, on the 404B claim. What is the government's position on that? Is the government's position that Sloan's testimony about Charles and Vassar's love to club out in California, does the government think that doesn't implicate 404B? No, Your Honor. It's our position that that doesn't implicate 404B. And why not? Is it because it's not a crime, wrong, or act? Is it because it was in response to rebuttal testimony? Would it be different if he had said gang? What's your position on this? Well, Federal Rule of Evidence 608 allows evidence that speaks to character for truthfulness to be admitted. And the defendants put Sloan's credibility for truthfulness at issue. He was the star witness in this case. And they were effectively implying that the government paid for his testimony with that $1,500. And so by opening that door, the prosecutor in the case rehabilitated Sloan by asking, did you have a legitimate reason to relocate? So you think 404B isn't implicated because it's 608 or 609? I thought it was 609, but you know better than me, probably 608. So 404B is just not implicated because it's rehabilitating the witness? Yes, Your Honor. That would be our position. Perhaps, yeah, I mean, if you're accusing him of making it up out of whole cloth, and he can say with specificity why he believed he was in danger, if he said they aren't a gang and I know that their gang will come get me, I think that you put that at issue when you accuse him of lying about being afraid. Okay. And then I don't think I saw a response to Vassar's argument about the guilt conversion table in the commentary. Vassar argues that those are not entitled to deference under Kaiser because they don't interpret anything, which kind of seems right to me. Do you have, I mean, it seems like a serious Riccardi issue anyway, and I don't know that the government responded to that. Do you have a position on that? Yes, Your Honor. So we did respond to it, the actual argument that Vassar put forward. He invokes Kaiser and lays up the controlling law, and then his resolution, without identifying another way to read converted drug weight, he says, this is confusing, it's too generous, doesn't propose an alternative reading, which seems to be the case law under Riccardi and Phillips, that you have to at least identify some sort of ambiguity before the district court. There's no ambiguity because there's nothing to interpret. I mean, it's just, I mean, what are we even interpreting? It's just saying we're going to tell you what the converted drug weight is, and then we delegate to ourselves the ability to decide what the converted drug weight is. Your Honor, they're not adding a numeric value like was the case in Phillips. They are simply doing the math for the district court. If you go through and look at 90,000 against the units for each of the listed drugs within 8C, you will get the same conversion ratio that's in the commentary. It's not adding anything of substance. It's quite literally doing the math for the judges. And let me give you an example. Flunitrazepam. Of course, I picked the longest name. Five point-well, I'll spare myself that one, unless that's an order, Your Honor. Flunitrazepam in the 90,000 drug weight category, that's level 38, 5.625 million units. When you go to the conversion, it tells you that one unit of flunitrazepam is 16 grams. And then you go convert grams to kilograms, which is not a substantive decision. That's something you can find on the Internet, which then gives you one unit is .016 kilograms. When you divide 5.625 million by .016, you get 90,000, which is the converted drug weight necessary to satisfy level 38. And if you go through and do this math for each drug, it will shake out that way. All right. Thank you. I'm happy to talk about the sentencing. I believe Ms. Vassar's counsel said he'd like to discuss that in the reply. So if there are any questions, I'm happy to discuss that now. Well, the gist of Vassar's argument is that there is a math error. He spends five pages going through these sort of conversions and saying, well, if you multiply this and round this, none of that is relevant. You don't have to do the math. It all turns on a flawed premise. What the district court is discussing in this isolated paragraph is how to manage the historical quantity of the meth, the historical quantity being what they computed from Sloan's testimony about October to December. The rest of the meth, I guess you could call it the non-historical quantities, were physically recovered by the DEA and tested. Well, when they get to this portion of the sentencing, after the defense counsel had said, well, Sloan said he purchased 15 pounds, he also said he might have another dealer. And the district court said, okay, that's fair. Under the case law, I'm required to err on the side of caution when estimating, meaning we don't have these drugs, and said, I'll go ahead and cut it by two-thirds. So he takes 10 of the 15 pounds off and says, even if there was only 5 pounds, you are still above 90,000. So can I ask you, what was kind of unclear to me is, you're right, that is what the district court did. But it wasn't clear to me what the two-thirds was even based on. I mean, it didn't seem to be tied necessarily to the testimony that while I was buying from multiple people, I probably only bought a third of that from this group. So was there any basis for that? And was there required to be? Your Honor, I don't believe he states a basis for the two-thirds. And I think that he's saying, when I err on the side of caution, I'm not just going to cut off 10% from the top. He's not identifying a specific buy and removing it. He's saying that based on the evidence we have, it's 15 pounds. The Sixth Circuit tells me to err on the side of caution. Well, cutting two-thirds is pretty cautious. Well, what makes that caution versus going to 25%, 15%? I guess that's my point because, you know, where the court landed was really at a place that kept you at 38.  And that's a fair point, Your Honor. And there is no reason based on the evidence he pitched two-thirds, at least that I see in the record. However, as for resolving this case, it's harmless error if that was an error because you could cut 100% of the historical amount and still have 90,000 kilograms of converted drug weight. And 4.5 kilograms of actual methamphetamine, right? Yes. So that just makes you a 38? Yes. So you could cut all of the drugs, the cocaine, the fentanyl, the heroin, and you have 4.5 kilograms. And for that same reason, Your Honor, you don't even have to address the commentary argument because this case can be resolved by saying, there's 4.5 kilograms of actual meth that's spelled out in the level 38 designation, and that could be the end of it. And the commentary argument's on plain error? Yes, Your Honor. It's at a minimum on plain error. They did not raise it. But I would go so far as to say it was an invited error because both defendants' counsel below conversed with the court about converted drug weight. They knew what they were talking about, and they both made arguments about why their sentencing should go down based on that term. So to the extent it is error, the defendants invited it. Judge Davis asked you, I think, also, where did the 15 pounds come from? And I know you explained how you got to the one-third out of three-thirds, but where in the record is it clear that there is 15 pounds? When you – so the actual number comes from the PSR, which is a record of 121 at 591 to 92. And what the probation office is basing that on is Sloan's testimony that between October and December, he purchased – he said 10 to 20 pounds, I think. He might have said 20. They took conservative steps along the way. But to answer your question, Your Honor, this was the number that came from October to December that Sloan specifically said, I purchased this much meth from Charles. But if I understand you correctly, your position is even if there was any error, it really doesn't matter because the October to December period in 2020, without it, he was at a level 38. Yes, Your Honor. The math bears that out. Any other questions? Honestly, my last point would be – sorry to go back to this Kaiser question because we all love doing math out loud. But even on the exact drug conversion being discussed here, Bassler takes issue with the two times verse 20. That comes from a statute, 21 U.S.C. 841 B1A. It shows that to have a mandatory minimum of 10 years, you need either 50 grams of actual or 500 grams of mixed. That shows you that Congress has designated actual meth as 10 times more culpable than meth mixture. And so how does that bear itself out in the conversion table? Two and 20. That's why you see a 10 times multiplier. Bassler takes issue with this, saying it's arbitrary, but it's really a policy decision Congress has made and the sentencing guidelines have enacted. And by asking this court, the resolution he seeks is that this court apply a two times multiplier, which if you were to strike down the commentary under a Kaiser logic, where does the two times come from? So I wanted to point out that, again, even when you talk about the meth here, the math bears itself out and there's no substantive issues with the commentary conversion table. One more question. I thought I heard your argument earlier that it would not have mattered if the reference had been to gangs. I'm a little bit struggling with that because it's a concerning statement to make. And if the reference had been to gangs, would not that have implicated a racial issue in this case that would have made a more significant issue for the defendants? Well, Your Honor, there is case law saying that reference to gangs is prejudicial. It implies violence. It implies some level of criminal activity. And Bassler cites the case saying that it can smack of racial prejudice. Those cases exist. And in those cases they're seeking to identify their gang membership truly as character evidence. It's not relevant to what's being discussed. And so here defendants themselves open the door for that answer. And you can see from the testimony, Sloan specifically tried to avoid saying the word gang. So to the extent that case law applies here, I don't think we have an issue. Thank you. Thank you. Thank you. Your Honor, I'd like to jump in on the 404B issue. I did not get to address it my first time. I do think it's particularly concerning. The witness said a club in California. He was clearly referencing a gang in California. The testimony had been that both of the defendants were from Los Angeles. He was implicating that they were gang members from Los Angeles that were violent and their gang was going to come and hurt him, which is problematic by itself. Well, he had to get out of town. So he had to get out of town. Isn't that the answer, that it's not improper testimony because it was an explanation for why he received money from the government because he needed to get out of town? Well, even if that is accurate, he went a step too far. And he knew he was going a step too far because he didn't use the word gang. He used the word club. I mean, it's not a club. It's a gang he was talking about. And why this is so damaging in this particular case is we've talked about how difficult the – how close the question and difficult the question on the conspiracy is. But if you think these two are two gang members from Los Angeles and they're going to send part of their gang back to beat you up for snitching on them, that goes a long way in the jury's mind saying, oh, maybe these people really are some sort of conspirator. They're not violent and they're not in a gang. They're two mid-50-year-old men who have trouble walking. So it's entirely inappropriate comment for him to have made. The government's argument that 608 somehow covers it is, I believe, incorrect. 608 says credibility of witnesses may be supported by character evidence for truthfulness and untruthfulness. I don't think that really goes to these people being in a gang. He could have said, I wanted to leave because they had just gone arrested. And I would also make a point, I should have made this earlier, Mr. Charles was in custody. He was arrested on June the 8th. He couldn't have done anything. So he shouldn't have been afraid of Mr. Charles. 608B is only uncrossed. This was elicited on direct. I am almost out of time. I would say I do want to make this statement. There was a statement counsel made that the drugs were brought in from Los Angeles. Respectfully, I don't think that's anywhere in the record. I know the government thought that. But I don't think there was any evidence anywhere in the record that the drugs that were found in Lexington. There's nothing in the record that indicates that these were California drugs, because the response of your opposing friend is that they were tested and they were California drugs. What do you know? They know that, I don't know. But is it or is it not in the record? I do not believe that is in the record. I know they brought ‑‑ I know two things. I know that there was questions about, because I think I asked these questions about whether or not the drugs, there was any drugs that were sent through the mail. They said they could not prove there was drugs that was all sent through the mail. They brought in DEA analysts, but they just talked about the purity. I mean, I think all the drugs come from Mexico, all the methamphetamine. I don't think you could ‑‑ They were sent through the mail, so I don't know where they came from. Oh, those ‑‑ there are some photographs, and I believe it was Officer Park where they talk about this. There is mail, U.S. Postal Service, that come through from Los Angeles, and they thought that's maybe how they were shipping it. But they tested that, and there was no evidence of that. And he says they checked with the Postal Service. I think I remember asking him that, and they said there was no proof that it was being mailed from California. And what were the pictures of that said it was from California? I'm sorry. There was mail with pictures of the fact that it came from California. What was that mail? Yes, ma'am. There is a, as I recall, there is a white manila folder that says U.S. Postal Service on it. I don't think it actually shows the address, but I think the testimony is it came from California. But I am very confident that there was no indication that testing that envelope, there were drug residue inside of that envelope. I believe that is an officer. It was an envelope from California to Mr. Charles. Yes, Your Honor. It was one of these white sort of U.S. Postal Service type things you get at the Postal Service. I believe my time is up. Do you have any comments to conclude? Your Honor, Mr. Perez hit it nail on the head that this was very confusing throughout this, and these men are looking at 380 months in prison. There are too many errors here, and this case should be remanded. Thank you. Your Honors, let me begin almost where I ended last time, but with, I guess, a summary thought. I'll quote my opponent today. You don't have to do the math. Yes, you do. We might not want to do the math. We may not think the math illustrates the legal principle, but, in fact, unfortunately the guidelines have become so complicated that we are required to do the math. The math is complicated. I acknowledge that. I acknowledge also one step back thought, the bigger picture. All of us in this courtroom today were guessing at the math. I even used the word guess in my reply. I mean, I know you just said the math matters, and now I'm going to say why does the math matter. Why does it matter if there's 4.5 kilograms of actual methamphetamine? That makes them a 38. That, I mean, I think it's actually 4.512. So by just a tiny little bit, he's over the hurdle. Three ways that matters, Your Honor. First, Judge Reeves says I can either reduce by three months, in other words, cut the 10 pounds in half on the controlled buys, or go to the historic quantities from October to December 2020. He chooses the latter. Had he chosen the former, my math shows he would have been below the 90,000 kilograms converted weight. Second, Mr. Vassar's sentence is based on inclusion of everything, including historic. The controlled buys, the house fines. Had the January 7th and January 14th, 2021, controlled buys between Sloan and Charles not been included, when Mr. Vassar had no role at all, there's not even evidence that he was in Kentucky at that time, he would have been below the 90,000 kilograms converted drug weight. I might quote also, in conjunction with this, a line from my co-defense counsel's reply brief. Excuse me, it's his opening brief. This is with regard to the January 7th and January 14th, 2021 buys. Government surveillance of Cloyd did show that Cloyd visited a known drug trafficker's house. Who? We don't know. Government had surveillance polls. They had trackers. They had live surveillance. They had in-person surveillance. And they can't keep control of where the drugs came from? And my guy's in L.A. How is that possibly relevant conduct? I go into my brief explaining that the district judge short-circuited the specific findings this very court requires. Didn't do it. I have bullet points in my brief of questions that aren't answered because the judge followed neither the requisite standards of this U.S. Sentencing Guideline 1B1.3, relevant conduct for conspiracies, or this court's law for specific findings when you hold someone accountable for someone else's conduct. Not done. The third reason, Your Honor, to answer your question. If we took out, and my math shows this again in the brief, in my opening brief, if we took out the drug quantities that are found in Mr. Charles' home upon the search on June 8th, 2021, take those amounts out, we again get below the 90,000 kilograms converted drug weight, by a significant margin, I might add. And it means something because it's at least two offense levels from Mr. Vassar. And why is that relevant? I don't know about anyone in this courtroom, but if I were to take a four-month period of where I've been, let's take that year, February to March, to April to May to June, and to be accused of having or being accountable for the products in someone's home in June of that year, when the last time I was there was four months earlier in February, sounds outrageous to me. I know the law is tough on this point, but that's why the math matters. I did, I told the court I did. I relied on an Excel spreadsheet. I created a model on this one. Why? The model has the ability to put in different scenarios that you could automatically calculate with confidence. Why is that important? Without that confidence, you can't be sure of your numbers. That's why I found the errors by the probation office and by the court. But, Your Honors, we're not just talking about math. My client is sitting in prison for over a quarter century because of that math. If we can't get it right, we all aren't doing our jobs. On the day I filed my brief, opening brief, August 25th, 2023, I filed it. I apologize, Your Honors, I filed it late in the day. The next day I received an email alerting me to an opinion from this court that was filed on August 25th, 2023. I cited in my reply brief, United States v. Thomas Matthews. It was a two-to-one decision, but it repeats law from the United States v. Byrd, law that applies here like a hand fitting a perfectly fitted glove. We should never, ever have to define or extrapolate what a district judge does at sentencing. We're all guessing. We shouldn't have to do that, Your Honor. My client sits in for over a quarter century of his life. It might as well be a lifetime sentence. He is not an angel. He would never say his. He's not a saint. I told this court in my opening statement that there were controlled buys against these two individuals on video. They know that. But to add or heap on all of this stuff when at the end of the day we have to take a step back and guess what was being done and to say the math doesn't matter, to Mr. Vassar it matters immensely. And to his counsel it does, too, because I know that when I talk with my client, he doesn't talk about Excel spreadsheets with me or numbers in those sheets. He talks about how long and how wrong he thinks that he has to suffer for conduct that's attributed to him that he didn't even know was going on. Your Honor, at the... I so appreciate your arguments. Thank you, Your Honor. They are very helpful, and we should also note that you have dedicated yourself both to the federal court defenders and to the CJA work of this court. And it is because of people who are willing to take CJA cases that the issues before us are litigated appropriately and understood appropriately. And so we appreciate your willingness to continue to do that. It's always an honor, Your Honor. Just doing my job. Thank you so much. And Mr. Sparks, too. Excuse me. I didn't have that in my notes. Thank you also because here together we have had really excellent briefing and excellent argument. And it's because we've got good attorneys who are willing to work with us and serve the ends of justice. So thank you both for your work.